1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

**TIMOTHY L. SMITH,**

Petitioner,

v.

**K. ALLISON, Warden, et al.,**

Respondents.

**Case No. 1:11-cv-01839 MJS (HC)**

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY**

**(Doc. 19)**

11
12
13
14
15
16
17

18      Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas

19  corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by Carlos A. Martinez

20  of the office of the California Attorney General. Both parties have consented to

21  Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). (ECF Nos. 6, 10.)

22  **I.      PROCEDURAL BACKGROUND**

23      Petitioner is currently in the custody of the California Department of Corrections

24  pursuant to a judgment of the Superior Court of California, County of Tulare, following

25  his conviction by a jury of two counts of assault with the intent to commit rape and two

26  counts of attempted rape of an unconscious person. (Clerk's Tr. at 304-05.) On

27  September 14, 2009, the trial court sentenced Petitioner to serve a determinate term of

28  eight years in jail. (Id.)

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate District, on May 25, 2010. (Lodged Doc. 3.) On April 14, 2011, the court, in relevant part, reversed the judgment of conviction with regard to the two counts of attempted rape of an unconscious person and otherwise affirmed the judgment with regard to the counts of assault with intent to commit rape. (Answer, Ex. A.) Petitioner filed a petition for review with the California Supreme Court on May 18, 2011. (Lodged Doc. 7.) The Supreme Court summarily denied the petition on July 20, 2011. (Id.)

Petitioner filed the instant federal habeas petition on November 3, 2011. (Pet., ECF No. 1.) In his petition, Petitioner presents three claims for relief: 1) that prosecution of counts four and five (relating to the Jill R. incident) were time-barred and violated the Ex Post Facto clause; 2) that he was prejudiced by the inclusion of the allegedly time-barred counts rendering his trial fundamentally unfair; and 3) that the trial court erred in refusing to discharge a biased juror. (Pet. at 6-7.)

Respondent filed an answer to the petition on February 23, 2012, and Petitioner filed a traverse to the answer on April 23, 2012. (Answer and Traverse, ECF Nos. 13, 17.) The matter stands ready for adjudication.

## II.   STATEMENT OF THE FACTS[1]

### FACTUAL BACKGROUND

### Counts 1 and 2

Counts 1 and 2 were based on an incident that occurred on the night of July 20, 2007. The victim Amanda Q. was 22 years old at the time. She got off work around 10:00 or 10:30 p.m., and socialized with a friend for a few hours at various locations. Around 1:30 a.m., Amanda drove to the Visalia Brewing Company to pick up Todd Lenaburg from work. Lenaburg and appellant were waiting together in the parking lot when Amanda arrived.

After Amanda picked up Lenaburg and appellant, they went to purchase alcoholic drinks to take back to Lenaburg's house. When they got back to the house, Amanda sat with Lenaburg at the dining room table, while appellant played his guitar near the pool table. After a short

---

[1]The Fifth District Court of Appeal's summary of the facts in its April 14, 2011 opinion is presumed correct. 28 U.S.C. § 2254(e)(1).

2

time, Amanda asked Lenaburg for some clothes to change into. Lenaburg took her to his bedroom and gave her basketball shorts and a t-shirt. He then returned to the living room and sat down with appellant while Amanda changed in the bedroom.

Amanda returned to the living room after she changed. After socializing for a couple of hours, Amanda told Lenaburg she was tired and wanted to go to bed. She then went to bed in his room. At some point, Lenaburg joined Amanda in bed and they both went to sleep. Lenaburg testified that when he went to bed, he closed the door to his bedroom and appellant was not in the room when he and Amanda went to sleep.

Amanda testified that she woke up and felt like she could not move. The shorts she had been wearing were on her right leg and appellant was on top of her, having sex with her. When she looked up, appellant put his finger over his mouth and told her "to shh." Amanda called out to Lenaburg, who woke up and started yelling at appellant. Appellant jumped up, started to put on his shorts, and then left the bedroom. Lenaburg testified that he ran out of the house to look for appellant but was unable to find him.

**Counts 4 and 5**

Counts 4 and 5 were based on an incident that occurred one night in the winter of 1999 or 2000. The victim Jill R. was around 19 or 20 years old at the time. Jill knew appellant because she was a close friend of his sister, Leanna Smith. On the night in question, Jill was sleeping on the floor in a room at the Smith family's house, when she awoke to find appellant lying on top of her, trying to insert his penis into her vagina. Her first thought was that her boyfriend, with whom she had fought earlier, had returned to the house. But after a few seconds, when she realized it was appellant, she yelled and pushed him off of her. Appellant left the room. He briefly returned, but Jill started hitting and yelling at him. Appellant then left the house.

**Uncharged prior incident**

On the night of May 26, 2003, Christie Carey went out with some male friends, including appellant. Later, they came back to the house, where Carey lived with her mother, and "just hung out and talked." Before she went to sleep, appellant approached Carey to "hook up," but she was not interested and declined his advances.

Later that night, Carey's mother, Peggy S., woke up to a man feeling her breasts. At first, she thought it was her cat, but then she was startled awake and saw the silhouette of a man. When she asked him what he was doing, he just laughed, turned, and tiptoed out the door.

The next morning, Peggy complained to Carey that she did not appreciate what Carey's friend had done and did not think it was funny. After learning her daughter knew nothing about it and that it was not a joke, Peggy filed a police report.

After speaking with her mother, Carey drove to the sporting goods store where appellant worked and confronted him. Appellant admitted touching Peggy's breasts and said, "Well, sweetie, I was really wishing it

1   was you."

**The defense**

Appellant denied that he tried to have sex with the victims when they were asleep. As to the incident involving Amanda, appellant admitted he had sex with her but claimed it was consensual. It started after he woke her up around 8:15 a.m., to get a ride home. According to appellant, after she awoke, Amanda made eye contact with him and started to remove one of the legs of her basketball shorts. She then pulled her knees up, which appellant interpreted as "a green light" to get into the bed. They then started to have sex.

As to the incident involving Jill, appellant testified that he did not know whether she was still in the house when he went into the room to get his clean laundry. Appellant, who was naked, tripped over Jill. Jill looked up and said, "Hey." Appellant got down on the floor with her and they embraced and started to kiss. They then "advanced to a missionary position." Once it became apparent that Jill was confused about his identity, appellant immediately got up and left the room. Jill hit appellant in the hallway and shouted at him.

As to the uncharged incident, appellant admitted feeling Peggy's breasts while she was asleep, but claimed he thought she was Carey. Appellant testified: "I thought that she would wake up. And maybe we could pursue something."

People v. Smith, 2011 Cal. App. Unpub. LEXIS 2766, 2-6 (Cal. App. 5th Dist. Apr. 14, 2011).

III.   **GOVERNING LAW**

A.   **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

B.   **Legal Standard of Review**

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

1    filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood,

2    114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of

3    the AEDPA; thus, it is governed by its provisions.

4         Under AEDPA, an application for a writ of habeas corpus by a person in custody

5    under a judgment of a state court may be granted only for violations of the Constitution

6    or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n.

7    7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

8    state court proceedings if the state court's adjudication of the claim:

9
10        (1) resulted in a decision that was contrary to, or involved an
          unreasonable application of, clearly established federal law, as
          determined by the Supreme Court of the United States; or

11
12        (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the State
          court proceeding.

13   28 U.S.C. § 2254(d).

14                 1.    Contrary to or an Unreasonable Application of Federal Law

15        A state court decision is "contrary to" federal law if it "applies a rule that

16   contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

17   that are materially indistinguishable from" a Supreme Court case, yet reaches a different

18   result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06.

19   "AEDPA does not require state and federal courts to wait for some nearly identical

20   factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

21   even a general standard may be applied in an unreasonable manner" Panetti v.

22   Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The

23   "clearly established Federal law" requirement "does not demand more than a 'principle'

24   or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state

25   decision to be an unreasonable application of clearly established federal law under §

26   2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

27   (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-

28   71 (2003).  A state court decision will involve an "unreasonable application of" federal

1   law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at

2   409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the

3   Court further stresses that "an *unreasonable* application of federal law is different from

4   an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529

5   U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks

6   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

7   correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541

8   U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

9   have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S.

10  Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

11  Federal law for a state court to decline to apply a specific legal rule that has not been

12  squarely established by this Court." Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

13  (2009), quoted by Richter, 131 S. Ct. at 786.

14                    2.    Review of State Decisions

15       "Where there has been one reasoned state judgment rejecting a federal claim,

16  later unexplained orders upholding that judgment or rejecting the claim rest on the same

17  grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

18  "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

19  (9th Cir. 2006).   Determining whether a state court's decision resulted from an

20  unreasonable legal or factual conclusion, "does not require that there be an opinion from

21  the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85.

22  "Where a state court's decision is unaccompanied by an explanation, the habeas

23  petitioner's burden still must be met by showing there was no reasonable basis for the

24  state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does

25  not require a state court to give reasons before its decision can be deemed to have been

26  'adjudicated on the merits.'").

27       Richter instructs that whether the state court decision is reasoned and explained,

28  or merely a summary denial, the approach to evaluating unreasonableness under §

2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Id.  To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787. It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

### 3.   Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

1   Strickland prejudice standard is applied and courts do not engage in a separate analysis

2   applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002).  Musalin

3   v. Lamarque, 555 F.3d at 834.

4   **IV.    REVIEW OF PETITION**

5       **A.    Claim One – Claims 4 and 5 Were Time Barred and Violated Ex Post**
6           **Facto Principles**

7       Petitioner contends that his federal constitutional rights were violated because

8   counts four and five were time barred. (Pet. at 6.) Specifically, Petitioner claims that it

9   violated Ex Post Facto principles to prosecute an offense through the use of a statue

10  that extended the limitations period after the limitations period expired. (Id.)

11      In response to this claim, Respondent first notes that on appeal Petitioner's

12  conviction for count four was vacated, and therefore Petitioner claim with regard to that

13  conviction is moot. The Court agrees and shall construe the argument as to count five,

14  for which Petitioner's conviction was affirmed on appeal.

15          1.    State Court Decision

16      Petitioner presented his claim in his direct appeal to the California Court of

17  Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

18  Court of Appeal and summarily denied in subsequent petition for review by the California

19  Supreme Court. (See Answer, Ex. A, Lodged Doc. 7.)  Since the California Supreme

20  Court denied the petition in a summary manner, this Court "looks through" the decisions

21  and presumes the Supreme Court adopted the reasoning of the Court of Appeal, the last

22  state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797,

23  804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that

24  higher court agrees with lower court's reasoning where former affirms latter without

25  discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000)

26  (holding federal courts look to last reasoned state court opinion in determining whether

27  state court's rejection of petitioner's claims was contrary to or an unreasonable

28  application of federal law under 28 U.S.C. § 2254(d)(1)).

8

In denying Petitioner's claim, the Court of Appeal explained that:

**I. Claim that Prosecution of Counts 4 and 5 was Time-Barred**

Appellant contends, and respondent concedes, that the prosecution of counts 4 and 5, the offenses involving Jill R., was time-barred. This is so, appellant argues, because the three-year statute of limitations for the offenses (§ 801) expired before the January 1, 2005 effective date of section 801.1, subdivision (b), which contains the 10-year statute of limitations under which the charges were prosecuted.**[FN3]** However, because, as we held in <u>In re White</u> (2008) 163 Cal.App.4th 1576, 1583 (<u>White</u>), "[t]he 10-year statute of limitations applicable to the crimes of which [appellant] was convicted was continuously in effect since January 1, 2001[,]" we reject appellant's contention and respondent's concession that the prosecution of the offenses was time-barred.

> **FN3.**Section 801.1, subdivision (b) provides, in relevant part: "(b) Notwithstanding any other limitation of time described in this chapter ... prosecution for a felony offense described in subdivision (c) of Section 290 shall be commenced within 10 years after commission of the offense." Appellant's offenses are included in section 290, subdivision (c): "Section 220 [assault with intent to rape], ... paragraph ... (4) ... of subdivision (a) of Section 261 [rape of an unconscious person] ...." and "the attempt ... to commit any of the above-mentioned offenses."

Counts 4 and 5 were alleged to have been committed between January 29, 1999 and December 31, 2000. In 1999, the statute of limitations for the offenses was three years. (§ 801.) However, on January 1, 2001, before the three-year limitations period had expired, an amendment to former section 803, subdivision (h)(1) extended the limitations period to 10 years. (Stats. 2000, ch. 235, § 1.)**[FN4]** Former section 803, subdivision (h)(1) is now codified in section 801.1, subdivision (b). (Added by Stats. 2004, ch. 368, § 1.)

> **FN4**. Former section 803, subdivision (h)(1), provided, in part: "Notwithstanding the limitation of time described in Section 800, the limitations period for commencing prosecution for a felony offense described in subparagraph (A) of paragraph (2) of subdivision (a) of [former] Section 290, where the limitations period set forth in Section 800 has not expired as of January 1, 2001 ... shall be 10 years from the commission of the offense." (Stats. 2000, ch. 235, § 1.) The offenses at issue in this case were described in former section 290, subdivision (a)(2)(A), as they are now in  [*9] section 290, subdivision (c).

Generally, for purposes of timeliness, a felony prosecution is commenced when an information or indictment is filed, when a defendant is arraigned on a felony complaint, or when an arrest warrant or bench warrant is issued. (§ 804.) Under the general rule, the filing of the information on March 5, 2009, commenced the prosecution. Under former section 803, subdivision (h)(1) and section 801.1, subdivision (b), the prosecution of the charges was commenced within the statutory limitations

period. (<u>White</u>, supra, 163 Cal.App.4th at pp. 1580-1581.)

Under none of the relevant statutory provisions was the prosecution for appellant's offenses against Jill R. ever time-barred. Thus, the "constitutional ex post facto clause protection against prosecution with a statute of limitations enacted after a previous statute of limitations period expired is inapplicable. (<u>See</u> <u>Stogner v. California</u> (2003) 539 U.S. 607, 609, 632-633 (<u>Stogner</u>); U.S. Const., art. I, § 10, cl. 1.) Here, the Legislature did not revive an expired statute of limitations period but simply extended one before expiration. That is constitutionally permissible. (<u>Stogner</u>, supra, [539 U.S.] at pp. 618-619; <u>People v. Terry</u> (2005) 127 Cal.App.4th 750, 775-776; <u>People v. Robertson</u> (2003) 113 Cal.App.4th 389, 393-394.)" (<u>White</u>, supra, 163 Cal.App.4th at p. 1583.)

In so concluding, we necessarily reject appellant's argument that, unlike section 801.1, subdivision (b), former section 803, subdivision (h)(1) did not extend to 10 years the limitations period for offenses subject to the three-year statute of limitations of section 801, but only extended the limitations period for offenses subject to the six-year statute of limitations of section 800.

Appellant relies on the maxim expressio unius est exclusio alterius (the expression of some things in a statute necessarily signifies the exclusion of other things not expressed) to support his assertion that, because former section 803, subdivision (h)(1) specifically referred to section 800 (i.e., "Notwithstanding the limitation of time described in Section 800"), and not to section 801, or any other limitations period, the Legislature must have intended the 10-years statute of limitation enacted in section 803, subdivision (h)(1) to apply only to offenses previously subject to the six-year limitations period of section 800.

Appellant's contention is belied by the Legislative history. (<u>See</u> <u>In re J. W.</u> (2002) 29 Cal.4th 200, 209 ["courts do not apply the expressio unius est exclusio alterius principle 'if its operation would contradict a discernible and contrary legislative intent.' [Citations.]"].) The Legislative Counsel's Digest accompanying the final chaptered bill enacting former section 803, subdivision (h)(1) states:

"Existing law provides statutes of limitations for the prosecution of crimes. Prosecution for an offense punishable by death or by imprisonment in the state prison for life or life without the possibility of parole may be commenced at anytime. *Prosecution for an offense punishable by imprisonment in the state prison for more than 8 years is required to be commenced within 6 years [(§ 800)]. Prosecution for other offenses that are punishable by imprisonment in the state prison are required to be commenced within 3 years[(§ 801)].*

"*This bill would permit the prosecution of certain sex offenses within one year of the date on which the identity of the suspect is conclusively established by deoxyribonucleic acid (DNA) testing, or within 10 years of the offense, whichever is longer, as specified, notwithstanding any other specified limitation of time.* The provisions of this bill would become operative only if SB 1342 is enacted." (Legis.

Counsel's Dig., Assem. Bill No. 1742, Stats. 2000, ch. 235, § 1, italics added.)

While the Legislative Counsel's summaries are not binding (State ex rel. Harris v. PricewaterhouseCoopers, LLP (2006) 39 Cal.4th 1220, 1233, fn. 9), they are entitled to great weight. (California Assn. of Psychology Providers v. Rank (1990) 51 Cal.3d 1,17.) "It is reasonable to presume that the Legislature amended those sections with the intent and meaning expressed in the Legislative Counsel's digest." (People v. Superior Court (Douglass) (1979) 24 Cal.3d 428, 434.) Here, it is reasonable to presume that the Legislature intended the 10-year statute of limitations to apply, as specified, to any offense described in former section 290, subdivision (a)(2)(A), which the instant offenses undisputedly are, regardless of whether they were previously subject to the six-year statute of limitations of section 800, or the three-year statute of limitations of section 801. It is also reasonable to presume that, despite the specific reference to section 800, the Legislature did not deliberately exclude reference to section 801 or any other limitations period. (See Barragan v. Superior Court (2007) 148 Cal.App.4th 1478, 1484, fn. 3 [the maxim expressio unius est exclusio alterius does not apply when no reasonable inference exists that items not mentioned were excluded by deliberate choice].)

In sum, because the 10-year statute of limitations applicable to appellant's offenses has been in effect since January 2001, we reject his claim that counts 4 and 5 were time-barred.

People v. Smith, 2011 Cal. App. Unpub. LEXIS 2766 at 6-13.

2.   Analysis

The California statute of limitations for criminal cases with potential sentences of fewer than eight years requires prosecution to commence within three years from the commission of the offense. Cal. Pen. Code § 801.[1] However, in 2001, the statute of limitations for certain sex offenses was modified. Section 803(h)(1) became effective, providing a ten-year statute of limitations for a listed sexual offense where the then-existing statute of limitations had not expired. 2000 Cal Stats. ch. 235. The list of criminal sex offenses included assault with the intent to commit rape under Section 220 - the provision under which Petitioner was prosecuted. In separate legislative acts, the ten-year statute of limitations was recodified and moved from Section 803(h)(1) to Section 803(i)(1), and later to Section 801.1(b), where it expressly lists prosecution for assault with the intent to commit rape under Section 220.

---

[1] All further references in this section shall be to the California Penal Code.

For a statute to violate the Ex Post Facto Clause, it must: (a) punish as a crime an act previously committed that was innocent when done; (b) make the punishment for a crime more burdensome after its commission; or (c) deprive one charged with crime of any defense available according to law at the time when the act was committed. Collins v. Youngblood, 497 U.S. 37, 42 (1990). A statute violates the Ex Post Facto Clause if it either revives an expired criminal prosecution by retroactively extending the statute of limitations or reduces the quantum of proof necessary to convict. Stogner v. California, 539 U.S. 607, 615 (2003); United States v. Jenkins, 633 F.3d 788, 799, n.2 (9th Cir. 2011). However, a statutory change that extends an unexpired statute of limitations "while the limitations periods were still running on the claims" does not violate the Constitution. Renderos v. Ryan, 469 F.3d 788, 795 (9th Cir. 2006).

Petitioner argues that his case was governed by the shorter, three-year limitations period under Section 801 that expired before the commencement of his criminal case, and not by the subsequently-enacted statute of limitations now provided in Section 801.1. Petitioner argues that his prosecution was unconstitutionally revived by changes to California law that occurred after he committed the charged offenses.

The Court of Appeal convincingly dispensed with that argument. The court concluded that the statute of limitations for Petitioner's criminal acts never expired, but was properly extended several times by the state legislature. Using the earliest offense date of January 29, 1999, the Court of Appeal noted that the change from the three-year to the ten-year limitation period occurred before the original limitations expiration date in January 2002. People v. Smith, 2011 Cal. App. Unpub. LEXIS 2766 at 6-13. That extended the latest charging date to January 2009.

The appellate court explained that, under state law, the legislative changes validly extended the statute of limitations to reach the 2008 filing of charges against Petitioner. (Clerk's Tr. at 1-7.) In doing so, the state court correctly stated the holdings in Stogner and state cases setting forth the relevant principles governing application of the Ex Post Facto Clause to statutes of limitations. (Id. at 7-8.)

The Court agrees with and defers to the Court of Appeal's conclusion that the statutory extensions did not violate the ex post facto prohibition. The applicable statute of limitations was moved, recodified, and amended over a period of time. However, it continuously governed the prosecution of the sexual offense that Petitioner committed. The prosecution of Petitioner did not violate the statute of limitations nor was a law applied to him in violation of the Ex Post Facto Clause. Rather, the state validly commenced this criminal case in 2008 by filing the complaint prior to the ten year expiration date in January, 2009. Thus, the state court's denial of Petitioner's claim was not an unreasonable application of or contrary to clearly established United States Supreme Court precedent.

### B.   Claim Two – Joinder of Time Barred Counts

Petitioner contends that his federal constitutional rights were violated because of the joinder of the allegedly time barred counts with the other charges. (Pet. at 6.) Specifically, Petitioner alleges that his trial was made fundamentally unfair by allowing the prosecution to present the claims. (Id.)

1.   State Court Decision

In the last reasoned decision denying Petitioner's claim, the appellate court concluded:

> In light of our conclusion that counts 4 and 5 were not time-barred, we reject appellant's related contention that he "was prejudiced by the joinder of the time-barred counts with the other charges." Appellant does not claim joinder of the counts was improper on any other ground.

People v. Smith, 2011 Cal. App. Unpub. LEXIS 2766.

2.   Analysis

As correctly argued by Respondent (Answer at 12), there is no clearly established Federal law which holds that joinder or consolidation of charges may violate the Constitution.   In United States v. Lane, 474 U.S. 438, 446, n. 8 (1986), the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if

1    it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair

2    trial." However, in <u>Collins v. Runnels</u>, the Ninth Circuit noted that the language of the

3    footnote was merely dicta:

> Lane dealt with the joinder of standards under Federal Rules of Criminal Procedure 8 and 52; no constitutional issue was before the Court. "[T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, *as opposed to the dicta*, of this Court's decisions as of the time of the relevant state-court decision." <u>Williams v. Taylor</u>, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (emphasis added). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The footnote upon which Collins relies did not set forth the governing legal principle in Lane. It was merely a comment.

11    <u>Collins v. Runnels</u>, 603 F.3d 1127, 1132 (9th Cir. Cal. 2010)

12       In ascertaining what is "clearly established Federal law," this Court must look to

13    the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

14    of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412. "In other words, 'clearly

15    established Federal law' under § 2254(d)(1) is the governing legal principle or principles

16    set forth by the Supreme Court at the time the state court renders its decision." <u>Id.</u> Given

17    that there is no clearly established Federal law in this instance, the Court cannot grant

18    relief.

19       Even if the Supreme Court's footnote is considered clearly established Federal

20    law, no constitutional violation occurred in this case. As thoroughly discussed by the

21    appellate court, the charges at issue were properly brought, did not violate the Ex Post

22    Facto Clause, and were not otherwise untimely. Petitioner's argument that the charges

23    were nothing more than prejudicial prior bad acts evidence is unavailing. Petitioner fails

24    to demonstrate that the joinder of valid, timely claims had a prejudicial effect such that

25    Petitioner was denied his Fifth Amendment right to a fair trial.

26       The state court adjudication of the claim did not result in a decision that was

27    contrary to, or involved an unreasonable application of, clearly established Federal law,

28    or result in a decision that was based on an unreasonable determination of the facts in

1  light of the evidence. 28 U.S.C. § 2254(d). Petitioner is not entitled to relief.

2  **C.**   **Claim Three – Failure to Discharge a Juror**

3  In his third and final claim, Petitioner contends that the trial court erred in failing to

4  discharge a juror who revealed during trial that he was an acquaintance of one of the

5  witnesses for the prosecution. (Pet. at 7.)

6  1.   State Court Decision

7  In the last reasoned decision denying Petitioner's claim, the appellate court

8  stated:

9  **III. Refusal to Discharge a Juror**

10  Appellant contends the judgment must be reversed because the
   trial court violated his constitutional right to due process when it refused to
11  discharge a juror who disclosed on the first day of testimony that he was
   casually acquainted with prosecution witness Todd Lenaburg. We reject
12  appellant's constitutional claim and conclude the trial court's ruling was not
   an abuse of discretion.
13
   **A. Background**
14
   During the afternoon session of the first day of testimony, Juror No.
15  10 alerted the bailiff that he recognized a person in the corridor who could
   be a potential witness in the case.**[FN5]** In response to questioning by the
16  court and the attorneys, Juror No. 10 explained that he encountered
   Lenaburg outside the courtroom and recognized him, by face but not by
17  name, as a casual social acquaintance. Juror No. 10 explained that he
   knew Lenaburg because his sister dated one of Lenaburg's coworkers at
18  the Visalia Brewing Company (VBC). The juror did not recognize
   Lenaburg's name on the witness list during voir dire because he was
19  "horrible at names."**[FN6]** Juror No. 10 stated that he would say "hi" to
   Lenaburg when he went to VBC, and he had also seen Lenaburg at two or
20  three social events, including a birthday party for his niece at the home
   where his sister lived with Lenaburg's coworker.
21
   **FN5**. The record identifies the juror in question both as Juror
22  No. 10 and as Juror No. 1002404. For simplicity's sake, we
   shall refer to him as Juror No. 10.
23
   **FN6**. In explaining his acquaintanceship with Lenaburg,
24  Juror No. 10 reminded the court and counsel that he had
   previously disclosed during voir dire both his difficulty
25  recalling names and the fact his sister dated someone who
   worked at VBC.
26
   However, Juror No. 10 did not know Lenaburg "on a personal level"
27  and "couldn't even recall his first name."**[FN7]** Lenaburg was not in the
   juror's "group of friends" and they had never "hung out ... on a one on one
28  basis" or "held a meaningful conversation." While expressing

understanding that appellant might feel "uneasy" about having him on the jury, Juror No. 10 assured defense counsel that appellant had no reason to feel uneasy and stated, "I am still a juror. I am here to listen to the facts." Juror No. 10 repeatedly confirmed that nothing about his acquaintanceship with Lenaburg would make it difficult for him to be fair or impartial in this case or "sway [his] decision in any way." Before Juror No. 10 returned to the jury room, the court and the attorneys each expressed their appreciation to him for his honesty and for bringing the matter to their attention.

> **FN7**. When Juror No. 10 first addressed the court, he mistakenly "assumed" Lenaburg's first name was "Tim." When defense counsel pointed out that appellant's first name was Tim ("This is Tim"), the juror replied, "Then the other T name." Juror No. 10 then confirmed he was referring to Lenaburg, who was sitting outside the courtroom.

After Juror No. 10 returned to the jury room, defense counsel asked the court to excuse the juror, explaining: "[I]f I felt that he just knew this fellow by face from going into the establishment once or twice or three times, I really wouldn't have that much concern. [¶] But when he said that this witness has attended family functions, knows some of his family members, that's a little too close." Initially, the trial court appeared inclined to grant defense counsel's request to dismiss Juror No. 10 based on counsel's representation that, had the juror disclosed the information the previous day during voir dire, counsel definitely would have exercised one of his peremptory challenges to excuse the juror. But, after briefly taking the matter under submission, the court declined to discharge the jury, explaining:

> "The issue that the Court needs to look at, and I think perhaps [the prosecutor] said this[,] is the issue of misconduct. And there is a case [People v. San Nicolas (2004) 34 Cal.4th 614 (San Nicolas)] at [page] 646, which deals with whether or not there is bias. And the Court has reviewed carefully the answers that Juror Number 10 ... gave. [¶] And the Court does not find that his answers indicate in any way that there is any bias. And so with that, I am not discharging him."

## B. Analysis

It is fundamental that a criminal defendant has a constitutional right to be tried by a fair and impartial jury, and the process of voir dire plays an essential role in securing this right. (In re Hitchings (1993) 6 Cal.4th 97, 110 (Hitchings).)

> "'Voir dire examination serves to protect [a criminal defendant's right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.' [Citation.] [¶] A

juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct. [Citations.]" (Hitchings, supra, 6 Cal.4th at pp. 110-111, fn. omitted.)

"When misconduct involves the concealment of material information that may call into question the impartiality of the juror, we consider the actual bias test .... 'Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect. "[T]he proper test to be applied to unintentional 'concealment' is whether the juror is sufficiently biased to constitute good cause for the court to find under ... sections 1089 and [former] 1123 that he is unable to perform his duty."**[FN8]** [Citation.] [¶] Whether a failure to disclose is intentional or unintentional and whether a juror is biased in this regard are matters within the discretion of the trial court. Except where bias is clearly apparent from the record, the trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination. [Citations.]' [Citation.]" (San Nicolas, supra, 34 Cal.4th at p. 644.)

> **FN8**. Section 1089 states in part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, ... the court may order the juror to be discharged and draw the name of an alternate ...."

"Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' The court will not presume bias, and will uphold the trial court's exercise of discretion ... under section 1089 if supported by substantial evidence." (People v. Holt (1997) 15 Cal.4th 619, 659.)

Applying these principles here, we conclude the trial court did not abuse its discretion in failing to excuse Juror No. 10. Substantial evidence supports the trial court's implied finding that Juror No. 10's nondisclosure was inadvertent and unintentional rather than deliberate. Substantial evidence also supports the court's conclusion that there was no indication of bias on the juror's part. Appellant does not claim the evidence showed otherwise.

Instead, appellant argues that, because defense counsel indicated he would have exercised a peremptory challenge to excuse Juror No. 10 had the juror disclosed his acquaintanceship with Lenaburg, the trial court's refusal to excuse Juror No. 10 violated appellant's statutory right to exercise peremptory challenges. Appellant contends the error violated his Fourteenth Amendment right to due process and the judgment should be reversed regardless of whether the juror's nondisclosure was intentional or unintentional or whether there was any showing of bias on the juror's part.

Appellant cites no authority directly supporting his position. He asserts generally that "[t]he arbitrary violation of a state-created right may infringe on a defendant's federal due process rights," citing Hicks v. Oklahoma (1980) 447 U.S. 343, 346.**[FN9]** But he has not shown the trial

17

court arbitrarily violated a state-law right. Rather, it appears the trial court properly followed well-established California Supreme Court precedent relevant to a request to discharge a juror for failing to disclose material information during voir dire. Appellant's assertion that the trial court erred in relying on San Nicolas, supra, 34 Cal.4th 614 is simply without merit. Although the nondisclosure of information by two jurors in that case was not discovered until months after the guilty verdicts were rendered (id. at p. 643), the legal principles the Supreme Court set forth are equally applicable to nondisclosures discovered, as here, during trial. Indeed, in San Nicolas, the Supreme Court expressly applied the test that it had previously adopted in People v. McPeters (1992) 2 Cal.4th 1148 (McPeters) (San Nicolas, at p. 644), which was a case where the juror's nondisclosure of information was discovered early in the trial, "[a]fter the jury was sworn but before opening statements were delivered." (McPeters, at p. 1174.)

> **FN9**. The decision in Hicks, supra, 447 U.S. 343, involved a trial court's jury instruction, the effect of which was to deprive a criminal defendant arbitrarily of a statutory right to have the jury exercise discretion in fixing his term of punishment. (Id. at pp. 345-347.)

The defendant in McPeters, supra, argued that the trial court violated his statutory and constitutional rights by failing to remove a juror who had not disclosed during voir dire that he was the real estate agent representing the seller in a real estate transaction in which the victim's husband was the buyer. (2 Cal.4th at p. 1174.) The Supreme Court rejected this argument and elucidated the proper standard of review as follows:

> "...[D]efendant contends the court's ruling violated both section 1089 and his Sixth Amendment right to an impartial jury. We disagree. Implicit in the court's finding and remarks was a determination that [the juror's] initial failure to disclose his relationship with [the victim's husband] was inadvertent and unintentional. Defendant does not challenge this determination and, indeed, argues that the trial court was required to remove [the juror] from the jury even if his failure to disclose his business transaction with [the victim's husband] was unintentional. Defendant is incorrect. Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect. '[T]he proper test to be applied to unintentional "concealment" is whether the juror is sufficiently biased to constitute good cause for the court to find under Penal Code sections 1089 and [former] 1123 that he is unable to perform his duty.' [Citation.]

> "Whether a failure to disclose is intentional or unintentional and whether a juror is biased in this regard are matters within the discretion of the trial court. Except where bias is clearly apparent from the record, the trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination. [Citations.]" (McPeters, supra,

18

2 Cal.4th at p. 1175.)

The Supreme Court upheld the trial court's conclusions that the lack of disclosure was inadvertent and that there was not any express or implied bias. (Ibid.)

Similarly, here, we find no basis in the record to second-guess the trial court's implicit determination that Juror No. 10's failure to disclose his slight acquaintanceship with Lenaburg was unintentional or the court's conclusion that the juror did not appear to be biased. Thus, we cannot say the trial court abused its discretion in declining to excuse Juror No. 10.

People v. Smith, 2011 Cal. App. Unpub. LEXIS 2766 at 13-23.

2.    Analysis

A trial court's failure to strike a biased juror for cause will not constitute a Sixth Amendment violation so long as the jury that sits is impartial. Ross v. Okla., 487 U.S. 81, 88, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988).

To justify a new trial based on a claim of juror bias, [Petitioner] must demonstrate that a dishonest answer was given on voir dire to a material question and that the correct response would have provided a valid basis for a challenge for cause, see McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984), or that his right to an impartial jury, guaranteed by the Sixth and Fourteenth Amendments, was otherwise violated by actual or implied juror bias, see Fields, 503 F.3d at 766-68; see also Morgan v. Illinois, 504 U.S. 719, 726-27, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992); Remmer v. United States, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654, 1954-1 C.B. 146 (1954). [Petitioner] must also surmount the "presumption of correctness" that we afford to the state courts' factual conclusions regarding the possibility of prejudicial misconduct. 28 U.S.C. § 2254(e)(1); see Thompson v. Keohane, 516 U.S. 99, 111, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) (noting requirement that presumptive weight be accorded to a trial court's resolution of factual issues, including juror impartiality, because the resolution of such issues "depends heavily on the trial court's appraisal of witness credibility and demeanor").

Hamilton v. Ayers, 583 F.3d 1100, 1107 (9th Cir. 2009).

In finding that no misconduct occurred with respect to the claim of bias of the jury foreperson, the California Court of Appeal found "no basis in the record to second-guess the trial court's implicit determination that Juror No. 10's failure to disclose his slight acquaintanceship with Lenaburg was unintentional or the court's conclusion that the juror did not appear to be biased." People v. Smith, 2011 Cal. App. Unpub. LEXIS 2766 at 13-23.

The state court decision was not an unreasonable application of clearly

19

1   established federal law. The juror was not well acquainted with the prosecution witness

2   and did not know the witness' name. The state court's determination that the juror's

3   failure to indicate that he knew the witness during vior dire was reasonable based on the

4   record. The juror provided consistent information, including statements during vior dire

5   that his sister dated someone at Visalia Brewing Company where the witness worked.

6   From this information, it is clear that the juror and witness might have had contact

7   before. Furthermore, the juror stated that he could be impartial despite having met the

8   witness previously.

9       Even though the juror made no overt comments of bias, a juror's implied bias can

10  still violate a petitioner's constitutional rights. In <u>Dyer v. Calderon</u>, implied bias was found

11  when a juror concealed a major crime that the juror knew was similar to the crime at trial,

12  specifically that the juror did not disclose that her brother had been murdered. 151 F.3d

13  970, 979 (9th Cir. 1998); <u>Hamilton v. Ayers</u>, 583 F.3d 1100, 1108 (9th Cir. 2009). On the

14  other hand, where a juror disclosed a past assault of his wife and stated he could be

15  impartial, no implied bias was found. <u>Fields v. Brown</u>, 503 F.3d 755, 764 (9th Cir. 2007).

16      The present case is like <u>**Fields**</u> and unlike <u>Dyer</u>. The juror disclosed that he had

17  reason to frequent the witness' place of work. He did not disclose that he knew the

18  witness; however his failure to disclose that during voir dire was reasonable in light of the

19  fact that he did not know the witness by name. The Ninth Circuit has implied bias in

20  those extreme situations where the relationship between a prospective juror and some

21  aspect of the litigation is such that it is highly unlikely that the average person could

22  remain impartial in his deliberations under the circumstances." <u>Fields</u>, 503 F.3d at 770.

23  As the juror's relationship with the witness was attenuated, it was not such an extreme or

24  extraordinary event as to infer implied bias on his behalf. The conclusion of the state

25  court that no misconduct occurred when the court failed to excuse the juror is not

26  contrary or an unreasonable application of United States Supreme Court authority.

27  Accordingly, Petitioner is not entitled to relief on this claim.

28

1    **V.    CONCLUSION**

2          Petitioner is not entitled to relief with regard to the claims presented in the instant

3    petition. The Court therefore orders that the petition be DENIED.

4    **VI.    CERTIFICATE OF APPEALABILITY**

5          A state prisoner seeking a writ of habeas corpus has no absolute entitlement to

6    appeal a district court's denial of his petition, and an appeal is only allowed in certain

7    circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). The controlling statute

8    in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which

9    provides as follows:

10         (a) In a habeas corpus proceeding or a proceeding under section 2255
11         before a district judge, the final order shall be subject to review, on appeal,
           by the court of appeals for the circuit in which the proceeding is held.

12         (b) There shall be no right of appeal from a final order in a proceeding to
13         test the validity of a warrant to remove to another district or place for
           commitment or trial a person charged with a criminal offense against the
14         United States, or to test the validity of such person's detention pending
           removal proceedings.

15         (c)    (1) Unless a circuit justice or judge issues a certificate of
16         appealability, an appeal may not be taken to the court of appeals from–

17                      (A) the final order in a habeas corpus
                        proceeding in which the detention complained
18                      of arises out of process issued by a State
                        court; or

19                      (B) the final order in a proceeding under
20                      section 2255.

21         (2) A certificate of appealability may issue under paragraph
           (1) only if the applicant has made a substantial showing of
22         the denial of a constitutional right.

23         (3) The certificate of appealability under paragraph (1) shall
           indicate which specific issue or issues satisfy the showing
24         required by paragraph (2).

     If a court denies a petitioner's petition, the court may only issue a certificate of
25
     appealability "if jurists of reason could disagree with the district court's resolution of his
26
     constitutional claims or that jurists could conclude the issues presented are adequate to
27
     deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v.
28

1   McDaniel, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the

2   merits of his case, he must demonstrate "something more than the absence of frivolity or

3   the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

4          In the present case, the Court finds that no reasonable jurist would find the

5   Court's determination that Petitioner is not entitled to federal habeas corpus relief wrong

6   or debatable, nor would a reasonable jurist find Petitioner deserving of encouragement

7   to proceed further.  Petitioner has not made the required substantial showing of the

8   denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a

9   certificate of appealability.

10                                         **ORDER**

11         Accordingly, IT IS HEREBY ORDERED:

12         1) The petition for writ of habeas corpus is DENIED;

13         2) The Clerk of Court is DIRECTED to enter judgment and close the case; and

14         3) The Court DECLINES to issue a certificate of appealability.

15

16

17

18

19

20

21   IT IS SO ORDERED.

22      Dated:   September 27, 2013           /s/ Michael J. Seng

23                                         UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28

22